# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| BEST RING, LLC and FCS PROCESSING, LLC, | § § § | |
| *Plaintiffs,* | § § | |
| v. | § § § | Cause No. 6:22-cv-00766-ADA-DTG |
| RONIN POS, LLC, MARC BARRY, KEVIN BOSQUEZ, ABIGAIL SCHAEFER, MOURAD DENDANE, SARA DENDANE, MAKINA LABORATORIES, INC., AHMED HADJERES, and 9429-2232 QUEBEC INC. A/K/A L'ATELIER DE PRODUIT A/K/A THE PRODUCT SHOP, | § § § § § § § § § § § | JURY TRIAL DEMANDED  PUBLIC VERSION |
| *Defendants.* | § § | |

## THIRD AMENDED COMPLAINT

This is an action for copyright and patent infringement, theft of trade secrets, breach of fiduciary duty, breach of contract, tortious interference with existing contract, tortious interference with prospective relations, and conspiracy, in which Plaintiffs make the following allegations against Defendants, most of whom, without authority, design, practice, utilize, make, manufacture, distribute, import, service, offer for sale, and/or sell products in this District and across the United States comprising point-of-sale systems and services that infringe on the Copyright and Patents asserted in this matter and defined below.

### PARTIES

### FCS Processing, LLC

1.     Plaintiff FCS Processing, LLC ("**FCSP**") is a Texas limited liability company conducting business at 801 Springdale Road, Austin, Texas. FCSP was formed in 2012 and is in

existence today. FCSP owns a copyright on source code relating to the point-of-sale software applications described herein. FCSP is the owner of all rights, title, and interest in and to United States Copyright Reg. No. TXu 2-315-518, including a supplementary registration application to the same (together, the "**Copyright**"). FCSP also owns a portfolio of patents that cover point-of-sale hardware and software with applications in the festival operations context, among other applications. FCSP is the owner of all rights, title, and interest in and to United States Patents No. 10,896,425 (the "**'425 Patent**"), 10,854,049 (the "**'049 Patent**"), and 11,361,322 (the "**'322 Patent**") (collectively, the "**Patents**").

### Best Ring, LLC

2.      Plaintiff Best Ring, LLC d/b/a Best Ring POS ("**Best Ring**") is a Texas limited liability company conducting business at 801 Springdale Road, Austin, Texas. Best Ring was formed in 2016 and is in existence today. Since its formation, Best Ring, through an implied and/or oral exclusive license for use of the technology covered by the Copyright and Patents and, upon their issuance, for use of the Copyright and Patents themselves, has provided point-of-sale hardware and software in the festival operations context. No other company holds a license to the technology covered by the Copyright and Patents or to the Copyright and Patents themselves. Best Ring has performed work in Waco, Texas, relating to the Copyright, the Patents, and the claims asserted herein.

### Ronin POS, LLC

3.      Defendant Ronin POS, LLC ("**Ronin**") is a Texas limited liability company conducting business at 2200 Ranch Loop Drive, New Braunfels, Texas, 78132, which is located in the Western District of Texas. On information and belief, Ronin designs, practices, utilizes, makes, manufactures, distributes, imports, services, offers for sale, and/or sells in the Western

District of Texas, the State of Texas, and elsewhere, point-of-sale devices that infringe the Copyright and Patents asserted in this matter. On information and belief, Ronin has derived substantial revenue from infringing acts in the Western District of Texas, including from the sale and use of infringing products.

**Marc Barry**

4.      Marc Barry ("**Barry**") is a natural person and the former president of Best Ring. As Barry has judicially conceded in public filings, Barry resides in New Braunfels, Comal County, Texas, which is located in the Western District of Texas. On information and belief, Barry designs, practices, utilizes, makes, manufactures, distributes, imports, services, offers for sale, and/or sells in the Western District of Texas, the State of Texas, and elsewhere, point-of-sale devices that infringe the Copyright and Patents asserted in this matter. On information and belief, Barry has derived substantial revenue from infringing acts in the Western District of Texas, including from the sale and use of infringing products.

**Kevin Bosquez**

5.      Kevin Bosquez ("**Bosquez**") is a natural person and former employee of Best Ring. On information and belief, Bosquez resides in Travis County, Texas, which is located in the Western District of Texas. On information and belief, Bosquez works in the State of Texas and in the Western District of Texas. This Third Amended Complaint refers to Defendants Ronin, Barry, and Bosquez collectively as the "**Ronin Defendants**."

**Abigail Schaefer**

6.      Abigail Schaefer ("**Schaefer**") is a natural person and a former employee of Best Ring. On information and belief, Schaefer resides in Travis County, Texas, which is located in the

Western District of Texas. On information and belief, Schaefer works in the State of Texas and in the Western District of Texas.

## Mourad Dendane

7.    Mourad Dendane ("**Mourad**") is a natural person, on information and belief, residing in Montreal, Canada. On information and belief, Mourad contracted with Ronin, a Texas entity, to design, make, practice, utilize, manufacture, distribute, import, service, offer for sale, and/or sell point-of-sale devices and/or parts therein for and use in the Western District of Texas, and he in fact designed, made, practiced, utilized, manufactured, distributed, imported, serviced, offered for sale, and/or sold in the State of Texas and the Western District of Texas, and elsewhere, point-of-sale devices and/or parts therein that infringe at least one of the Patents asserted in this matter. On information and belief, Mourad has derived substantial revenue from infringing acts in the Western District of Texas, including from utilizing the Patents as a roadmap to design, develop, practice, utilize, distribute, import, service, offer for sale, and/or sell point-of-sale devices and/or parts therein that were made or especially adapted for practicing the inventions in the Patents, with knowledge that the point-of-sale devices and/or parts therein are not a staple article or commodity of commerce suitable for substantial non-infringing use. Specifically, Mourad utilized knowledge he acquired from Plaintiffs and/or one or more other Defendants to design and develop point-of-sale devices and/or parts therein that Mourad knew or otherwise should have known would infringe the hardware and/or software components of the Patents, and there is no substantial non-infringing use of said products.

## Sara Dendane

8.    Sara Dendane ("**Sara**") is a natural person, on information and belief, residing in Montreal, Canada. On information and belief, Sara contracted with Ronin, a Texas entity, to

design, make, practice, utilize, manufacture, distribute, import, service, offer for sale, and/or sell point-of-sale devices and/or parts therein for use in the Western District of Texas, and she in fact designed, made, practiced, utilized, manufactured, distributed, imported, serviced, offered for sale, and/or sold in the State of Texas and the Western District of Texas, and elsewhere, point-of-sale devices and/or parts therein that infringe at least one of the Patents asserted in this matter. On information and belief, Sara has derived substantial revenue from infringing acts in the Western District of Texas, including from utilizing the Patents as a roadmap to design, develop, practice, utilize, distribute, import, service, offer for sale, and/or sell point-of-sale devices and/or parts therein that were made or especially adapted for practicing the inventions in the Patents, with knowledge that the point-of-sale devices and/or parts therein are not a staple article or commodity of commerce suitable for substantial non-infringing use. Specifically, Sara utilized knowledge she acquired from Plaintiffs and/or one or more other Defendants to design and develop point-of-sale devices and/or parts therein that Sara knew or otherwise should have known would infringe the hardware and/or software components of the Patents, and there is no substantial non-infringing use of said products.

### Makina Laboratories Inc.

9.      On information and belief, Makina Laboratories Inc. ("**Makina**") is a corporation incorporated under the laws of Canada. On information and belief, Makina's principal place of business is at 4857 rue Sainte-Catherine East, Montreal, Qc H1V 1Z7, Canada. On information and belief, Makina contracted with Ronin, a Texas entity, to design, make, practice, utilize, manufacture, distribute, import, service, offer for sale, and/or sell point-of-sale devices and/or parts therein for use in the Western District of Texas, and elsewhere, and it in fact designed, made, practiced, utilized, manufactured, distributed, imported, serviced, offered for sale, and/or sold in

the State of Texas and the Western District of Texas, and elsewhere, point-of-sale devices and/or parts therein that infringe at least one of the Patents asserted in this matter.  On information and belief, Makina has derived substantial revenue from infringing acts in the Western District of Texas, including from utilizing the Patents as a roadmap to design, develop, practice, utilize, distribute, import, service, offer for sale, and/or sell point-of-sale devices and/or parts therein that were made or especially adapted for practicing the inventions in the Patents, with knowledge that the point-of-sale devices and/or parts therein are not a staple article or commodity of commerce suitable for substantial non-infringing use. Specifically, Makina utilized knowledge it acquired from Plaintiffs and/or one or more other Defendants to design and develop point-of-sale devices and/or parts therein that Makina knew or otherwise should have known would infringe the hardware and/or software components of the Patents, and there is no substantial non-infringing use of said products. This Third Amended Complaint refers to Mourad, Sara, and Makina as the "**Makina Defendants**."

### Ahmed Hadjeres

10.      Ahmed Hadjeres ("**Hadjeres**") is a natural person, on information and belief, residing in Montreal, Canada. On information and belief, Hadjeres contracted with Ronin, a Texas entity, to design, make, practice, utilize, manufacture, distribute, import, service, offer for sale, and/or sell point-of-sale devices and/or related software for use in the Western District of Texas, and he in fact designed, made, practiced, utilized, manufactured, distributed, imported, serviced, offered for sale, and/or sold in the State of Texas and the Western District of Texas, and elsewhere, point-of-sale devices and/or related software therein that infringe the Copyright and at least two of the Patents asserted in this matter. On information and belief, Hadjeres has derived substantial revenue from infringing acts in the Western District of Texas, including from utilizing the Patents

6

as a roadmap to design, develop, practice, utilize, distribute, import, service, offer for sale, and/or sell point-of-sale devices or software that was made or especially adapted for practicing the inventions in the Patents, with knowledge that the point-of-sale devices or software is not a staple article or commodity of commerce suitable for substantial non-infringing use. Specifically, Hadjeres utilized knowledge he acquired from Plaintiffs and/or one or more other Defendants to design and develop point-of-sale devices and/or related software that Hadjeres knew or otherwise should have known would infringe the software components of the Patents, and there is no substantial non-infringing use of said products.

### 9429-2232 Quebec Inc. a/k/a L'Atelier de Produit a/k/a The Product Shop

11.     On information and belief, 9429-2232 Quebec Inc. a/k/a L'Atelier de Produit a/k/a The Product Shop ("**Quebec**") is a corporation and/or joint stock company and/or company incorporated under the laws of Canada. On information and belief, Quebec's principal place of business is at 404-22365 Saint-Patrick, Montreal, Qc, H3k 1B3. On information and belief, Quebec contracted with Ronin, a Texas entity, to design, make, practice, utilize, manufacture, distribute, import, service, offer for sale, and/or sell point-of-sale devices and/or software therein for use in the Western District of Texas, and elsewhere, and it in fact designed, made, practiced, utilized, manufactured, distributed, imported, serviced, offered for sale, and/or sold in the State of Texas and the Western District of Texas, and elsewhere, point-of-sale devices and/or software therein that infringe the Copyright and two of the Patents asserted in this matter. On information and belief, Quebec has derived substantial revenue from infringing acts in the Western District of Texas, including from utilizing the Patents as a roadmap to design, develop, practice, utilize, distribute, import, service, offer for sale, and/or sell point-of-sale devices or software that was made or especially adapted for practicing the inventions in the Patents, with knowledge that the

point-of-sale devices or software is not a staple article or commodity of commerce suitable for substantial non-infringing use. Specifically, Quebec utilized knowledge it acquired from Plaintiffs and/or one or more other Defendants to design and develop point-of-sale devices and/or related software that Quebec knew or otherwise should have known would infringe the software components of the Patents, and there is no substantial non-infringing use of said products. In fact, Quebec lists Ronin as a "Client" on Quebec's website, which highlights a "Case Study" regarding Ronin.[1] This Third Amended Complaint refers to Hadjeres and Quebec as the "**Quebec Defendants**." This Third Amended Complaint refers to the Ronin Defendants, Schaefer, the Makina Defendants, and the Quebec Defendants as "**Defendants**."

### JURISDICTION AND VENUE

12.    This is an action for, among other things, patent infringement, copyright infringement, and misappropriation of trade secrets under the laws of the United States. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), & 1836(c).

13.    This Court has personal jurisdiction over Ronin because Ronin has substantial contacts in this District, including by maintaining a place of business in the District and purposefully availing itself of the benefits and protections of the laws of Texas by being registered to conduct business in Texas. Ronin has committed acts of copyright infringement, patent infringement, and misappropriation of trade secrets in this District, in Texas, and elsewhere in the United States. Ronin submitted to the jurisdiction of this Court by answering this lawsuit.

14.    This Court has personal jurisdiction over Barry because Barry is domiciled in and conducts business in this District and has substantial contacts in this District. Barry has committed

---

[1] *See* "Case Studies: Ronin," THE PRODUCT SHOP, https://www.productshop.io/portfolio./ (last visited Jul. 6, 2023).

acts of copyright infringement, patent infringement, and misappropriation of trade secrets in this District, in Texas, and elsewhere in the United States. Barry submitted to the jurisdiction of this Court by answering this lawsuit.

15.    This Court has personal jurisdiction over Bosquez because Bosquez is domiciled in and conducts business in this District and has substantial contacts in this District. Bosquez has committed acts of misappropriation of trade secrets, breach of contract, and breach of fiduciary duty in this District, in Texas, and elsewhere in the United States. Bosquez submitted to the jurisdiction of this Court by answering this lawsuit.

16.    This Court has personal jurisdiction over Schaefer because Schaefer is domiciled in and conducts business in this District and has substantial contacts in this District. Schaefer has committed acts of misappropriation of trade secrets and breach of contract in this District, in Texas, and perhaps elsewhere in the United States. In addition to residing in this Texas and this District, Schaefer has minimum contacts with this District and Texas by purposefully directing her business activities toward this District and Texas and by purposefully availing herself of the privileges of conducting activities in this District and Texas. Specifically, Schaefer has worked as both an employee and a contract laborer in this District and Texas, and has entered into a valid and enforceable contract with Best Ring made the basis for one of Best Ring's claims against Schaefer in this lawsuit. Schaefer has committed acts of misappropriation of trade secrets, breach of fiduciary duties, and breach of contract in this District and Texas.

17.    The Court has personal jurisdiction over each of the Makina Defendants, directly and/or through the activities of their intermediaries, subsidiaries, affiliates, agents, related entities, distributors, importers, customers, and/or consumers, due to the relationship among the Makina Defendants, the forum, and this litigation. Specifically, the Makina Defendants purposefully

directed their activities toward this District and Texas and purposefully availed themselves of the privileges of conducting activities in this District and Texas by, among other things, intentionally conducting business with and contracting with Ronin, a Texas entity, to design, make, practice, utilize, manufacture, distribute, import, service, offer for sale, and/or sell point-of-sale devices and/or parts therein, while knowing or understanding that such products would be sold and used in the United States and in this District, and by in fact designing, practicing, utilizing, placing, and/or inducing and contributing to place infringing products into the stream of commerce while knowing or understanding that such products would be sold and used in the United States and in this District, as well as by providing service and support to Ronin in this District and Texas in connection with their contract and their related conduct. On information and belief, the Makina Defendants committed the acts of infringement and/or contributed to the acts of infringement asserted herein with respect to one or more claims of at least one of the asserted Patents described below, within this District and Texas, through conduct arising or resulting from, or relating to, their contacts with this District and Texas. On information and belief, the Makina Defendants committed the acts of misappropriation of trade secrets asserted herein, within this District and Texas, through conduct arising or resulting from, or relating to, their contacts with this District and Texas. Exercising personal jurisdiction over the Makina Defendants would be fair and reasonable; it would not offend traditional notions of fair play and substantial justice.

18.     In the alternative, this Court has personal jurisdiction over each of the Makina Defendants under Federal Rule of Civil Procedure 4(k)(2), because claims asserted against the Makina Defendants for patent infringement and trade secret misappropriation in this action arise under federal law, the Makina Defendants are not subject to the jurisdiction of the courts of general

jurisdiction of any state, and exercising jurisdiction over the Makina Defendants is consistent with the U.S. Constitution.

19.    The Court has personal jurisdiction over each of the Quebec Defendants, directly and/or through the activities of their intermediaries, subsidiaries, affiliates, agents, related entities, distributors, importers, customers, and/or consumers, due to the relationship among the Quebec Defendants, the forum, and this litigation. Specifically, the Quebec Defendants purposefully directed their activities toward this District and Texas and purposefully availed themselves of the privileges of conducting activities in this District and Texas by, among other things, intentionally conducting business with and contracting with Ronin, a Texas entity, to design, make, practice, utilize, manufacture, distribute, import, service, offer for sale, and/or sell point-of-sale devices and/or related software, while knowing or understanding that such products would be sold and used in the United States and in this District, and by in fact designing, practicing, utilizing, placing, and/or inducing and contributing to place infringing products and/or software into the stream of commerce while knowing or understanding that such products and/or software would be sold and used in the United States and in this District, as well as by providing service and support to Ronin in this District in connection with their contract and their related conduct. On information and belief, the Quebec Defendants committed the acts of infringement and/or contributed to the acts of infringement asserted herein with respect to one or more claims of at least one of the asserted Patents described below, within this District and Texas, through conduct arising or resulting from, or relating to, their contacts with this District and Texas.  On information and belief, the Quebec Defendants committed the acts of misappropriation of trade secrets asserted herein, within this District and Texas, through conduct arising or resulting from, or relating to, their contacts with

this District and Texas. Exercising personal jurisdiction over the Quebec Defendants would be fair and reasonable; it would not offend traditional notions of fair play and substantial justice.

20.    In the alternative, this Court has personal jurisdiction over each of the Quebec Defendants under Federal Rule of Civil Procedure 4(k)(2), because claims asserted against the Quebec Defendants for patent infringement and trade secret misappropriation in this action arise under federal law, the Quebec Defendants are not subject to the jurisdiction of the courts of general jurisdiction of any state, and exercising jurisdiction over the Quebec Defendants is consistent with the U.S. Constitution.

21.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this District; and/or Defendants have each committed acts of infringement in this District; and/or Defendants have each a regular and established place of business in this District; and/or a substantial part of the events giving rise to the claims occurred in this District; and/or because the Makina Defendants and the Quebec Defendants are subject to the Court's personal jurisdiction in this District. Further, venue is proper in this District for the Makina Defendants and the Quebec Defendants pursuant to 28 U.S.C. § 1931(c)(3) because they are foreign corporations and persons.

## SINGLE ACTION

22.    This suit is commenced against Defendants pursuant to 35 U.S.C. § 299 and Federal Rule of Civil Procedure 20 in a single action because (a) a right to relief is asserted against Defendants jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences relating to the various patent and non-patent claims asserted against Defendants herein and (b) questions of fact common to all Defendants will arise in the action.

## THE ASSERTED COPYRIGHT AND PATENTS

23.     United States Copyright Registration No. TXu 2-315-518 for the copyrighted work entitled Point of Sale Application, was issued by the United States Copyright Office on May 10, 2022. Attached as **Exhibit 1** is a true and correct copy of the registration certificate and the supplementary registration application, correcting the author and copyright claimant name on the registration certificate to reflect FCSP.

24.     FCSP is the owner of the entire right, title, and interest in the Copyright.

25.     FCSP owns copyrights in the code, documentation, specifications, and other materials that comprise the Copyright.

26.     Best Ring is the owner of an implied and/or oral exclusive license to the Copyright.

27.     The Copyright covers source code underlying the point-of-sale software applications that Plaintiffs have utilized in the festival operations context.

28.     Source code is a set of statements and instructions using a computer programming language that provides for the operation of some computer function, such as a software application.

29.     Source code is considered a literary work and copyrightable subject matter under 17 U.S.C. § 102(a), and is protected under the Copyright Act, 17 U.S.C. §§ 101, *et seq.*

30.     United States Patent Number 10,896,425, entitled Dedicated Point of Sale Over an Intermittent Network, was duly and legally issued on January 19, 2021, and names Jeff Waughtal as the sole inventor. Attached as **Exhibit 2** is a true and correct copy of the '425 Patent.

31.     FCSP is the owner of the entire right, title, and interest in the '425 Patent.

32.     Best Ring is the owner of an implied and/or oral exclusive license to the '425 Patent.

33.     United States Patent Number 10,854,049, entitled Hardened Remote Point of Sale Terminal, was duly and legally issued on December 1, 2020, and names Jeff Waughtal as the sole

inventor. On August 2, 2022, the United States Patent Trademark Office issued a Certificate of Correction under 35 U.S.C. 254 correcting an office mistake in Column 15 Line 20 of Claim 1. Attached as **Exhibit 3** is a true and correct copy of the '049 Patent, including the Certificate of Correction.

34.     FCSP is the owner of the entire right, title, and interest in the '049 Patent.

35.     Best Ring is the owner of an implied and/or oral exclusive license to the '049 Patent.

36.     United States Patent Number 11,361,322, entitled Dynamic Point of Sale ('POS') Transaction Processing for Networked Computing Devices, was duly and legally issued on June 14, 2022, and names Jeff Waughtal as the sole inventor. Attached as **Exhibit 4** is a true and correct copy of the '322 Patent.

37.     FCSP is the owner of the entire right, title, and interest in the '322 Patent.

38.     Best Ring is the owner of an implied and/or oral exclusive license to the '322 Patent.

### FACTUAL ALLEGATIONS

39.     Austin entrepreneur Jeff Waughtal ("**Waughtal**") began developing the technology underlying the Patents and Copyright around 2011, a short time prior to when he formed FCSP in 2012. After the formation of Best Ring in 2016, FCSP[2] granted Best Ring an oral and/or implied exclusive license for use of the technology covered by the Copyright and Patents and, upon their issuance, for use of the Copyright and Patents themselves. Best Ring is a pioneer in the field of cashless point-of-sale systems and services (sometimes called "**POS**"), particularly in the music festival operations context. Waughtal is the sole ultimate owner of both Plaintiffs.

40.     The copyrighted and patented FCSP-owned technology that is exclusively licensed to Best Ring has many and evolving applications. For example, Best Ring provides the point-of-

---

[2] In 2020, Waughtal assigned the Copyright and Patents to FCSP.

sale systems and services used to facilitate concession and merchandise transactions at large music festivals like the Austin City Limits Music Festival and the Lollapalooza Music Festival, among numerous others.

41.     Ronin, Barry, the Makina Defendants, and the Quebec Defendants have no right to practice or use the intellectual property protected by the Copyright or the Patents.

42.     In addition, Plaintiffs have spent a decade developing their specialized technological systems and services in the competitive POS industry, and therefore possess valuable confidential and proprietary information. For example, Plaintiffs have developed proprietary payment processing systems and methodologies, manufacturing processes and procedures, business plans, business prospects, training manuals, pricing procedures, market strategies, internal performance statistics, financial data, confidential personnel information concerning consultants or employees, operational or administrative plans, information about past, present or future products, services, software, research and development, customer information and pricing, supplier and vendor information and pricing, inventions, processes, techniques, designs, technical information and data, and terms and conditions of contracts and agreements. Some of these are encompassed in the Copyright and Patents hereto. Further, Plaintiffs have also developed a wealth of resources, including goodwill, forms, know-how, relationships, password-protected accounts, including social media accounts and followers, equipment, and policies that enable it to do productive work and to compete effectively against other POS systems and services providers.

43.     Plaintiffs take care to protect their information from disclosures and its resources from misuse. For example, as a POS technology provider, Best Ring has implemented—and continually implements and updates on an ongoing basis—security procedures and features to comply with certain evolving payment card industry ("**PCI**") data security standard requirements,

which set out the technical and operational requirements for organizations accepting or processing payment transactions, and for software developers and manufacturers of applications and devices used in those transactions.[3] Best Ring has password and encryption protections on its internal information, including protected access to the Amazon Web Services platform used to host the data and services underlying the Copyright and Patents; the GitHub account used to store the source code underlying the Copyright and the Patents; the Google Drive-based (cloud-based) storage of Best Ring's institutional information; the Quickbase platform used to centralize Best Ring's proprietary data; and the like.

44.     Barry was aware of these and other security features, as well as the sensitive and confidential nature of Plaintiffs' valuable proprietary information, including by virtue of his role as President of Best Ring. In fact, underscoring Barry's awareness to that end, Barry (including in his role as President of Best Ring) countersigned confidentiality, nondisclosure, and/or non-compete agreements between Plaintiffs and their employees and contractors.

45.     Bosquez likewise was aware of the sensitive and confidential nature of Best Ring's valuable proprietary information and signed a non-disclosure agreement with Best Ring that both acknowledged the confidentiality of such technical and business information and also obligated Bosquez to keep such information confidential.

A.     **Barry's Tenure as a Best Ring Employee**

46.     When Waughtal founded FCSP around 2012, Barry was working as a barback for one of Waughtal's other ventures, Stubb's Bar-B-Q. Barry was not a computer programmer or a software developer. Waughtal hired Barry to assist with building the company, which included

---

[3] *See* "PCI Security," PCI SECURITY STANDARDS COUNCIL,
https://www.pcisecuritystandards.org/pci_security/ (last visited Jul. 6, 2023).

overseeing testing and refining of the systems and hardware comprising the technology covered by the Copyright and the Patents. Eventually, Barry was designated President of Best Ring. Barry was employed by FCSP (and then Best Ring) from roughly 2012 until early 2020 and worked at Waughtal's direction throughout his tenure.

47.    As a Best Ring officer and employee, Barry had knowledge of and access to the source code comprising the Copyright and the technology comprising the Patents, as well as Best Ring's confidential and proprietary information described above; Barry had the ability to appropriate such information, including the source code. Waughtal and Best Ring trusted Barry—a corporate officer—to maintain the confidentiality of such sensitive proprietary information.

48.    That trust was misplaced. In February or March 2020, Barry walked off the job in the middle of a team meeting after being confronted about his poor performance based on analytics. Barry subsequently returned to work and asked to be reinstated. Best Ring allowed Barry to return to work, albeit with limited responsibilities as head of one department among several within the company. Shortly after Barry was reinstated, the COVID-19 pandemic hit. Given that Best Ring's primary revenue-generating application depended on mass public gatherings at large music festivals, the pandemic severely downgraded Best Ring's future revenue projections. Around April 2020, Waughtal made the difficult decision to furlough all of Best Ring's employees, including Barry to the degree his employment had been reinstated, until further notice. Shortly thereafter, in late April 2020, Waughtal brought back a small crew of employees to see the company through the COVID-19 crisis. Barry was not asked to join the small crew of employees that returned. Barry's employment with Best Ring was formally terminated effective May 4, 2020.

49.    After he left Best Ring, Barry had access to all or part of Plaintiffs' intellectual property and confidential and proprietary information because he took his Best Ring-issued

computer with him, although he later returned the computer to Best Ring. On information and belief, when Barry left he took Plaintiffs' intellectual property and confidential and proprietary information and carried it away with him to Ronin. Barry later recruited Bosquez to join Ronin, thus breaching Bosquez's nondisclosure agreement with Best Ring.

**B.    Barry Launches Ronin a Few Months after Leaving Best Ring and Uses Best Ring's Confidential Information to Compete Against Best Ring**

50.    Within months of leaving his job with Best Ring, Barry launched direct competitor Ronin in fall 2020 and claims to have developed full-scale competing technology within a roughly one-year period—the same technology that has taken Best Ring more than a decade to develop. On information and belief, Barry began working on Ronin prior to its formal launch in fall 2020. On information and belief, and given its striking resemblance to Best Ring's technology as well as the rapidity with which it came to the market, Ronin is built on the platform of Plaintiffs' intellectual property and confidential and proprietary information—including trade secrets comprising, among other things, design information, manufacturing processes and information, and materials vendor and sourcing information. In short, Barry and Ronin have misappropriated Plaintiffs' trade secrets and Ronin's point-of-sale system infringes on the Copyright and Patents.

51.    Since its founding, Ronin has competed against Best Ring in bidding for contracts to provide POS systems and services at several festivals within Best Ring's existing customer base, and Ronin has taken several such contracts away from Best Ring, including, at a minimum: ██████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████, thus causing Best Ring to lose contracts that it otherwise would have had a reasonable probability of securing. In addition, on information and belief, Ronin has interfered with Best Ring's ability to bid for contracts at ███████████ ███████████████████—former Best Ring customers whose relationships with Best Ring suddenly

and unexpectedly terminated when Barry launched Ronin. On information and belief, Ronin is able to significantly undercut Best Ring's fees because Ronin's technology benefits from the development costs borne by Plaintiffs. All the contracts won by Ronin are former customers of Best Ring whose identities and unique customer profiles would have been known to Barry by virtue of his position as a Best Ring employee. Until Ronin's interference, Best Ring expected to continue all such customer relationships. By contrast, Ronin has not been successful in bidding against Best Ring for new customers whose identities and profiles were not known by Barry as of the time of his departure from Best Ring.

52.    The following table summarizes the festivals for which Ronin has won contracts that Best Ring otherwise would have had a reasonable probability of securing:

| Festival | Location | Date(s)[4] |
|---|---|---|
| ██████████ | ███████████ | ███████████ |
| ██████████████ | ███████████ | █████████████ |
| ████████████████ | █████████████ | ████████ |
| ██████████████████ | ███████████████ | ████████████ |
| █████████████ | █████████████ | ████████████ |

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████

---

[4] The Ronin Defendants have concealed and resisted Plaintiffs' efforts to discover date-specific information regarding the Ronin Defendants' tortious conduct. Plaintiffs therefore make these allegations on information and belief.

C.    **The Makina Defendants and the Quebec Defendants Contract with the Ronin Parties to Develop the Infringing Point-of-Sale Technology.**

53.    On information and belief, and as Plaintiffs discovered during the course of this litigation, shortly after Barry left Best Ring, he signed a master services agreement with the Makina Defendants on December 1, 2020, in which the Makina Defendants agreed to design and develop certain hardware to be utilized in Ronin's infringing point-of-sale devices. Specifically, the Makina Defendants developed the printed circuit board, the hardware case, and the metal stand on which the point-of-sale cases and devices rest, likely among other things, utilized in Ronin's infringing devices. On information and belief, the Makina Defendants' design and development occurred from around January 2021 through all or part of 2022.

54.    Further, on information and belief, Barry signed a software development agreement with the Quebec Defendants on December 15, 2020, in which the Quebec Defendants agreed to design and develop certain software and/or source code utilized in Ronin's infringing point of sale devices.[5] Specifically, the Quebec Defendants designed most or all parts of the source code and software for Ronin's point-of-sale devices that infringe Plaintiffs' Copyright and at least two of their Patents. On information and belief, the Quebec Defendants design and development occurred from around January 1, 2021 through all or part of 2022.

55.    On information and belief, all or some of the Makina Defendants and the Quebec Defendants communicated with Barry and Canadian lawyers Jean-Nicolas Delage and Christian Jacques of the law firm Fasken Martineau DuMoulin in which Plaintiffs' Patents were discussed.

---

[5] On information and belief, Hadjeres performed the software development and programming work under multiple company names, including "9429-2232 Quebec Inc.," "L'Atelier de Produit," and/or "The Product Shop."

Thus, the Makina Defendants and the Quebec Defendants had actual knowledge of Plaintiffs' Patents when they designed the infringing technology for the Ronin Parties.

> ### D. Best Ring Notifies Barry and Ronin of the Patents, Imputing Actual Knowledge of Their Existence, as well as Barry's Misappropriation of Best Ring's Confidential Information

56.    In December 2020, upon discovering Ronin's sudden entry into the market, Best Ring notified Barry and Ronin of its concerns that Barry and Ronin were infringing on Best Ring's intellectual property and that Barry was misappropriating Best Ring's confidential and proprietary information. **Exhibit 5**. Best Ring provided express notice of the existence of the '425 Patent and the '049 Patent. *Id.* Best Ring made clear that, in light of such notice, any infringement by Barry and Ronin "would be willful, intentional, and in bad faith, giving rise to punitive and enhanced damages and attorney's fees under the Patent Act." *Id.* at 2. In a second letter sent in June 2021, Best Ring reiterated these concerns and again reminded Ronin that "any infringement would be willful, intentional, and in bad faith." **Exhibit 6**. Barry and Ronin did not respond to Best Ring's June 2021 letter.

> ### E. Barry and Ronin Recruit Schaefer to Breach Her Non-Compete Agreement with Best Ring

57.    Schaefer was a long-time employee of Best Ring. Schaefer entered a valid and enforceable Class B Incentive Unit Agreement ("Non-Compete Agreement") with Best Ring in October 2018. Barry was the president of Best Ring when Schaefer signed the Non-Compete Agreement. The Non-Compete Agreement contains a non-competition clause in which Schaefer agreed not to "join" or "be connected with" any person "engaged in a business owning, operating, managing, providing services to, or investing in 'point of sale' software or related systems" for the duration of her employment by Best Ring and for a period of two years thereafter.

58.     Barry and Ronin recruited Schaefer to work for Ronin, and Schaefer began working with and for Ronin in 2021, fewer than two years after her April 2020 termination from Best Ring. On information and belief, Barry, as the former president of Best Ring, had knowledge of Schaefer's Non-Compete Agreement and the non-competition provision contained therein—at a minimum, Barry was aware that Schaefer had been offered the Non-Compete Agreement and may have signed it. As discussed at length herein, Barry and Ronin are in the business of providing point of sale software and services to their customers, and are therefore direct competitors of Best Ring. Notwithstanding those realities, Barry and Ronin recruited, induced, and caused Schaefer to join Ronin in violation of the Non-Compete Agreement.

**F.     Barry and Ronin Recruit Bosquez to Breach His Confidentiality Agreement with Best Ring**

59.     Bosquez was employed by Best Ring as an on-site support technician to service the Best Ring POS system when deployed in the field. In September 2019, Bosquez signed a detailed nondisclosure agreement with Best Ring. Bosquez received a salary from Best Ring through June 2020, at which point he ceased being a paid employee and Best Ring began contracting him as an on-site support technician on a festival-by-festival basis. Best Ring paid Bosquez for work on a contract basis through August 2021. Bosquez remained subject to his obligations arising from the nondisclosure agreement that he signed.

60.     Barry and Ronin recruited Bosquez to work for Ronin, and Bosquez began formally working for Ronin full time by January 2022 at the latest, coinciding with the ████████ ████—which Best Ring believes was the first festival contract that Ronin took from Best Ring. On information and belief, Bosquez's business relationship with Barry and Ronin predated his formal tenure as a Ronin employee. On information and belief, Bosquez has disclosed Best Ring's

confidential information to Barry and Ronin in breach of the nondisclosure agreement that he signed with Best Ring.

### G.    The Ronin Defendants and Schaefer Brazenly Misappropriate Best Ring's Twitter Account

61.    Notwithstanding Best Ring's repeated warnings—and confirming Best Ring's worst fears—the Ronin Defendants continued to overtly misappropriate Best Ring's confidential and proprietary information.

62.    As described above, Schaefer is a former long-time employee of Best Ring as well as Waughtal through his other related entities. After working as a web and graphic designer, photographer, and festival technician, she became Best Ring's director of operations in 2019. In her capacity and role as a Best Ring employee, Schaefer created a Twitter account for Best Ring and had access to that account's password during her tenure at Best Ring. Schaefer was ultimately terminated from Best Ring around the end of April 2020.

63.    Notwithstanding Schaefer's Non-Compete Agreement that prohibited her from competing with Best Ring, Barry and Ronin induced, recruited, and hired Schaefer to work as a contractor and/or an employee for Barry and Ronin. Around November 2021, while a contractor or employee for Ronin, Schaefer used Best Ring's Twitter account password to access the account, without Best Ring's permission or knowledge. Having hacked into the account, Schaefer changed the contact email address associated with the account from a Best Ring email address to an email address that Plaintiffs believe was associated with Barry and/or to which Barry had access.  Indeed, in a signed witness statement discovered by Plaintiffs during discovery in this litigation, Schaefer *admits* that she "decided to change the Twitter account from a Best Ring account to an account for Ronin POS, LLC." Having hacked into the account, Schaefer then replaced the Best Ring branding with Ronin branding. On information and belief, Barry had knowledge of this misappropriation

and theft and worked with and/or authorized Schaefer to perpetrate it, the two having discussed the scheme over a Slack Platform communication. In other words, after Best Ring spent years building its brand and Twitter followers, Schaefer and Barry used Best Ring's confidential and proprietary Twitter account password to misappropriate and steal the account, and its following, for Ronin's benefit.

### H.    Barry Discloses Best Ring's Information to Yet Other Competitors

64.    Around the same time, in November 2021, Best Ring discovered that an individual named Stephen Tyler ("**Tyler**") won the contract to provide POS systems and services for Wurstfest in New Braunfels, Texas—a former client of Best Ring—causing Best Ring to lose out on an additional contract that it otherwise would have had a reasonable probability of securing. On information and belief, Tyler's devices infringe on the Copyright and Patents. On information and belief, Barry partnered with Tyler in some capacity prior to November 2021 and disclosed Best Ring's confidential and proprietary information to Tyler in the course of that relationship.

65.    Defendants' continued wrongful and unlawful conduct leaves Plaintiffs with no choice but to file this lawsuit in order to protect their interests.

### COUNT 1—INFRINGEMENT OF U.S. COPYRIGHT NO. TXU 2-315-518<br>(AGAINST BARRY, RONIN, AND THE QUEBEC DEFENDANTS)[6]

66.    Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

67.    FCSP is the rightful owner of the Copyright, and Best Ring, as the owner of an implied and/or oral exclusive license, is the only entity authorized to use the copyrighted material.

68.    The copyrighted material is source code relating to the point-of-sale software applications described above

---

[6] To the extent any claims or remedies alleged herein are inconsistent or conflicting, Plaintiffs reserve their right to plead in the alternative.

69.     Source code is considered a literary work and copyrightable subject matter under 17 U.S.C. § 102(a), and is protected under the Copyright Act, 17 U.S.C. §§ 101, *et seq.*

70.     Plaintiffs have at all times complied with the Copyright Act and all other laws of the United States regarding the Copyright.

71.     Barry, Ronin and the Quebec Defendants have no independent rights in the Copyright.

72.     FCSP never authorized Barry, Ronin or the Quebec Defendants to use, copy, or create derivative material based on the Copyright.

73.     Barry, Ronin, and the Quebec Defendants' actions are and were performed without the permission, license, or consent of FCSP.

74.     By virtue of the facts alleged above and on information and belief, Barry, Ronin, and the Quebec Defendants are willfully infringing on FCSP's and Best Ring's exclusive rights to the Copyright under 17 U.S.C. § 106, by (1) copying the source code or substantial elements and portions of it, (2) using the source code or substantial elements and portions of it, and (3) distributing the source code or substantial elements and portions of it, all without authority or permission from FCSP. These uses directly infringe on the Copyright.

75.     Barry, Ronin, and the Quebec Defendants violated FCSP's clearly established rights under the Copyright Act, of which a reasonable person would have been aware.

76.     On information and belief, Barry, and the Quebec Defendants profited or benefited from their infringing conduct.

77.     Barry, Ronin, and the Quebec Defendants harmed the potential market for and value of FCSP's Copyright by directly competing with Best Ring, as licensee of FCSP and sole

authorized user of the Copyright, in the festival operations context and by diverting profits from Plaintiffs.

78.    As a direct and proximate result of Barry, Ronin, and the Quebec Defendants' infringing conduct, Plaintiffs have sustained and will continue to sustain substantial injury, loss, and damages.

79.    Plaintiffs seek recovery of all actual and consequential damages caused by this infringement of the Copyright under 17 U.S.C. § 504(b), and further seek disgorgement of any benefit received by Barry, Ronin, and the Quebec Defendants' as a result.

### COUNT 2—INFRINGEMENT OF U.S. PATENT NO. 10,896,425
### (AGAINST BARRY, RONIN AND THE QUEBEC DEFENDANTS)

80.    Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

81.    The inventions claimed in the '425 Patent, taken alone or in combination, were not well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention. Rather, the '425 Patent claims and teaches, *inter alia*, improvements in customer relationship management and point of sale payment processing at remote event spaces, by utilizing specialized hardware and software to process payment transactions. The process improved upon payment processing for remote event spaces by adding the capability to dynamically adjust payment processing methods based on network connectivity.

82.    The invention in the '425 Patent has pioneered a new system and method to process payments when a network was intermittently connected. The improvements therein have aided customers in capturing sales transactions and verifying transactions with financial institutions.  In particular, the advancements within the '425 Patent have enabled payment processing at festivals and outdoor venues, and have improved vendor and customer experience. In remote environments network connectivity is a key component to processing financial transactions and verifying credit

and funds availability. The '425 Patent establishes a system and method to solve the problem of intermittent network connection in processing financial transactions and seeks to validate transactions to prevent customer fraud.

83.     The inventions claimed in the '425 Patent represent technical solutions to an unsolved technological problem that required specialized knowledge and experience to achieve. The written description of the '425 Patent describes, in technical detail, each of the limitations in the claims, equipping a person of ordinary skill in the art to understand what those limitations cover, and therefore what was claimed, and also to understand how the non-conventional and non-generic ordered combination of the elements of the claims differ markedly from what had been performed in the industry. More specifically, the '425 Patent claims a dynamic Customer Relationship Management ("CRM") system for location based intermittently-connected networked events. The system includes a dedicated mobile computing device and a transactions server. The dedicated mobile computing device has an encased water-resistant and heat-resistant casing. The dedicated mobile computing device is further equipped with a processor coupled through a bus system to a memory and a communications adapter. The dedicated mobile computing device has a point-of-sale application to process transactions in two modes. First, a real-time transaction mode determines, based on network connectivity, whether or not a real time transaction may be supported. Second, a batch mode supports batching a transaction and queuing the transaction for later-delivery and initiating the batch transaction when the network supports a transaction with the transaction server. Further, the '425 Patent claims a method for point of sale transaction processing for location based intermittently-connected networked events. The method comprises receiving a purchase request, and creating by a point-of-sale application a real-time transaction request. The point-of-sale application initiates a transmission to the real-time request

to a transaction server, and determines whether or not the transaction was completed with the transaction server. The point-of-sale application then determines if the transaction was not completed by initiating a batch transaction request, wherein by batching the transaction request the confirmation of sale is initiated when network connectivity is established.

84.     Barry, Ronin, and the Quebec Defendants have directly infringed, and continue to infringe at least claim 1 and claim 11 of the '425 Patent by making, using, testing, selling, offering for sale, and/or importing into the United States products, components, and by conducting services covered by one or more claims of the '425 Patent. On information and belief, Barry, Ronin, and the Quebec Defendants' point-of-sale products and/or services infringe the '425 Patent, by using the aforementioned hardware and software, either alone or in combination, that operate in substantially the same manner (together the "Accused '425 Products" or "Accused Products").

85.     Claim 1 of the '425 Patent is reproduced below:

*1. A dynamic Customer Relationship Management ('CRM') system for location based intermittently-connected networked events, the system comprising:*
*a dedicated mobile computing device, wherein the dedicated mobile computing device is coupled for data communications;*

*a transactions server, a transactions server, wherein the transactions server is connected through an intermittently-connected network to the dedicated mobile computer;*

*wherein the dedicated mobile computer comprises:*
*a mobile computer body; the mobile computer body encased in a water-resistant and heat-resistant casing;*

*the mobile computer including:*
*a computer processor coupled through a bus system with computer memory and a data communications adapter;*

*the computer processor and computer memory configured with a point of sale ('POS') application adapted to process transactions, the application configured to at least two modes:*
*real-time mode receives a sales transaction;*

28

*determines whether the intermittently-connected network supports a real-time transaction with the transaction server; and*

*if the intermittently-connected network supports a real-time transaction with the transaction server; initiating the transaction as a real-time transaction with the transaction server; and*

*if the intermittently-connected network cannot support a real-time transaction with the transaction server;*

*batch mode performs batching the transaction and queuing the transaction for later-delivery and initiating the transaction as a batch transaction when the intermittently-connected network supports a transaction with the transaction server.*

86.    The Accused '425 Products provide a customer relationship management system for location based intermittently-connected networked events, comprising a dedicated mobile computing device coupled for data communications, as seen below:



# FESTIVAL FOCUSED

Quick set up and easy to use point of sale designed for any and all temporary use situations. The team at Ronin is comprised of individuals with over three decades of combined festival and event POS experience. Ronin understands the unique needs and potential problems that are typical in event and festival environments and have designed this POS to effectively and successfully handle them all.

Ronin accepts almost all types of payment including credit, RFID/cashless, NFC/In-App and cash. Ronin was developed with festival and event sponsorships in mind. Sponsor promotions such as BOGO and bonus funds are easily applied. Ronin also offers both closed (loaded funds) and open loop (tokenized) RFID payment options.

# CUSTOMER CARE

Ronin understands the level of stress that accompanies festival and event production. Therefore, we offer full-time customer support before, during and after each event that we service. Festivals that require more than 50 points of sale often opt for on-site support. Ronin has a team of dedicated, knowledgeable and hardworking techs that are typically the first to arrive and last to leave the event. Vendors also have the capability of configuring their own menus, changing prices, defining product types, creating users, and more. Clerks find the system to be incredibly intuitive and typically need only a short overview before they're ready to start selling.

# VENUES

Although Ronin specializes in temporary use situations, we also offer a robust point of sale for stationary venues. Ronin is ideally suited for outdoor and indoor music venues, food trucks, quick service model, satellite bars, pop up locations, VIP areas, etc.

# REPORTING

Ronin provides clients with a full reporting suite that includes: Sales Reports, Clerk Reports, Product Mix Reports, Financial Reports and Payment Results Report. Clients can access their reports at anytime and on any type of device. The number of users is unlimited and reports can be tailored to specific users.

87.    The Accused '425 Products interact with a transactions server to the dedicated mobile computer, through the financial transactions and data centered reporting, as seen below:



**Versatile**

RFID/Cashless, NFC/In-App, Credit, Tokenized Payment, Promo Capabilities, and Cash

**Data Centered**

Full Reporting Suite with Real-Time Reporting

88.    On information and belief, the Accused '425 Products are mobile computing devices that are equipped with a water-resistant and heat-resistant casing, as seen below:



89.    The Accused '425 Products are mobile computers equipped with processors, a bus system, memory, and data communications adapters, by virtue of being a tablet computing device, as seen below:

31



90.     The Accused '425 Products are mobile computers configured with a point-of-sale application adapted to process transactions, as seen below:



91.     On information and belief, the Accused '425 Products are configured with a point-of-sale application with a real-time mode to receive sales transactions, and to determine whether an intermittently connected network supports a real-time transaction with a transaction server. If the intermittently connected network supports a real-time transaction, the point-of-sale application initiates the real-time transaction with the transaction server.

92.     On information and belief, the Accused '425 Products are configured with a point-of-sale application that determines if it cannot support a real time transaction of the intermittently-connected network, then it enters batch mode and performs batching and queuing of the transaction

for later-delivery when the intermittently-connected network supports a transaction with the transaction server.

93.    Claim 11 of the '425 Patent is reproduced below:

> *11. A method for dynamic Point of Sale ('POS') transaction processing for location based intermittently-connected networked events, the method comprising:*
>
> *receiving, by a POS application from a customer, a purchase request;*
>
> *creating, by the POS application, a real-time transaction request;*
>
> *initiating, by the POS application to a transaction server, a transmission of the real-time transaction request;*
>
> *determining, by the POS application, whether the initiated transmission was completed; and*
>
> *if the initiated transmission was completed, receiving, by the POS application from the transaction server a real-time transaction response and confirming or denying the sale in dependence upon the real-time transaction response; and*
>
> *if the initiated transmission was not completed, batching a batch transaction request; wherein batching the transaction request the confirmation of sale is initiated at a point when network connectivity is established.*

94.    On information and belief, the Accused '425 Products provide a method for dynamic point-of-sale transaction processing for location based intermittently-connected networked events, comprising a point-of-sale application that receives a purchase request and initiates a real-time transaction request to a transaction server.

95.    On information and belief, the Accused '425 Products provide a point-of-sale application that determines whether an initiated real-time transaction request was completed, and if the transaction was completed provides a response confirming or denying the sale.

96.    On information and belief, the Accused '425 Products provide a point-of-sale application that if the transaction request did not complete a batch transaction, wherein batching the transaction the confirmation of sale is initiated at a point when network connectivity is established.

97.    Additionally, Barry, Ronin, and the Quebec Defendants, have been, and currently are, active inducers of infringement of the '425 Patent under 35 U.S.C. § 271(b) and a contributory infringer of the '425 Patent under 35 U.S.C. §271(c).

98.    Barry, Ronin, and the Quebec Defendants have actively induced, and continue to actively induce, infringement of the '425 Patent by intending that others (vendors, customers, users), use the Accused '425 Products, including services covered by one or more claims of the '425 Patent. Barry, Ronin, and the Quebec Defendants provide these products and services in substantially the same form as Plaintiffs, wherein customers, partners, vendors, subscribers, and users, who, in turn, in accordance with Barry, Ronin, and the Quebec Defendants' design, intent, and directions, use, provision for use, and offer services on the Accused '425 Products in the United States that directly infringe one or more claims of the '425 Patent as described above. Barry, Ronin, and the Quebec Defendants' inducement further includes various intake forms, instructions, and direction into using the Accused '425 Products, as seen below:

34



99.     The Barry, Ronin, and the Quebec Defendants have contributed to, and continue to contribute to, the infringement of the '425 Patent by others by knowingly providing one or more components, for example the tablet device, and/or software such as the point-of-sale software responsible for the accused infringing functionality described herein, and that, when installed, configured, or equipped, and used by others, as intended by Barry, Ronin, and the Quebec Defendants, directly infringe one or more claims of the '425 Patent.

100.    Barry, Ronin, and the Quebec Defendants knew of the '425 Patent, but were willfully blind to its existence. Barry has had actual knowledge of the '425 Patent since at least the filing of the application on January 28, 2019, by virtue of his role as President of Best Ring.

101.    Plaintiffs will rely on direct and/or circumstantial evidence to prove the intent element. *See Fuji Photo Film Co. v. Jazz Photo Corp*., 394 F.3d 1368, 1377 (Fed. Cir. 2005) ("A patentee may prove intent through circumstantial evidence."); *Water Techs. Corp. v. Calco, Ltd*., 850 F.2d 660, 668 (Fed. Cir. 1988) ("While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice.").

102.    As a result of Barry, Ronin, and the Quebec Defendants' acts of infringement, Plaintiffs have suffered and will continue to suffer damages, the specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial, but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the Patents.

### COUNT 3—INFRINGEMENT OF U.S. PATENT NO. 10,854,049<br>(AGAINST BARRY, RONIN, AND THE MAKINA DEFENDANTS)

103.    Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

104.    The inventions claimed in the '049 Patent, taken alone or in combination, were not well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention. Rather, the '049 Patent claims and teaches, *inter alia*, improvements in a payment processing apparatus for use at remote event spaces, by utilizing specialized hardware that ensures resiliency when utilized at concerts, festivals, outdoor venues, and more. The improved apparatus is hardened against the elements, and in combination with additional hardware elements allows for superior durability and functionality in remote event spaces.

105.    The inventions claimed in the '049 Patent represent technical solutions to an unsolved technological problem that required specialized knowledge and experience to achieve. The written description of the '049 Patent describes, in technical detail, each of the limitations in the claims, equipping a person of ordinary skill in the art to understand what those limitations cover, and therefore what was claimed, and also to understand how the non-conventional and non-generic ordered combination of the elements of the claims differ markedly from what had been performed in the industry. More specifically, the '049 Patent claims a payment processing apparatus for use in remote point-of-sale transactions. The apparatus includes a dedicated mobile computing device equipped with a hardened enclosure which prevents water and dust from entering. The hardened enclosure is comprised of a plastic resin shell and a rubber inner seal, it is

36

also accompanied with an adaptable railing system, transparent display shielding, a magnetic strip card reader, a chip card reader, a radio frequency identification module ("RFID") module, an accessory battery, and handle grips. In combination these features represent a solution to a technical problem of processing financial transaction within a remote environment that is susceptible to intermittent internet connection and harsh weather, as well as physical abuse from use in a field environment, such as a concert or venue.

106.    The apparatus covered by the '049 Patent differs markedly from the prior apparatuses in use at the time of the invention, all of which lacked the combination of features to increase durability and reliability as well as accept a diverse set of payment instructions from physical and digital means, including RFID payment processing in a water tight and dust proof enclosure.

107.    The apparatus covered by the '049 Patent is drawn to solve a specific, technical problem arising in the context of point-of-sale payment transaction in a remote event space.

108.    Barry, Ronin, and the Makina Defendants have directly infringed, and continue to directly infringe, literally and/or by the doctrine of equivalents, individually and/or jointly, at least claim 1 of the '049 Patent by making, using, testing, selling, offering for sale, and/or importing into the United States products and components covered by one or more claims of the '049 Patent. On information and belief, Barry, Ronin, and the Makina Defendants' point-of-sale products, including but not limited to the Katana Tablet mobile computing device, infringe the '049 Patent, by using the aforementioned hardware, either alone or in combination, that operate in substantially the same manner (together the "Accused '049 Products" or "Accused Products").

109.    Claim 1 of the '049 Patent is reproduced below:

> *1. A payment processing apparatus for use in remote Point of Sale ('POS') transactions, the payment processing apparatus comprising:*

*a dedicated mobile computing device; wherein the dedicated mobile computing device is equipped with a hardened enclosure which prevents water and dust from entering the dedicated mobile computing device;*

*wherein the hardened enclosure comprises:*

*a plastic resin shell;*

*a rubber inner seal;*

*an adaptable railing system; wherein the adaptable railing system allows a display of the dedicated mobile computing device to be tilted for user viewing;*

*display shielding; wherein the display shielding is a transparent layer that allows viewing of the display configured to the dedicated mobile computing device;*

*a magnetic strip card reader; wherein the magnetic strip card reader is integrated in the plastic resin shell and is configured to communicate with the dedicated mobile computing device;*

*a chip card reader; wherein the chip card reader is integrated in the plastic resin shell and is configured to communicate with the dedicated mobile computing device;*

*a radio frequency identification module (RFID); wherein the radio frequency identification module is integrated in the plastic resin shell and is configured with the dedicated mobile computing device;*

*an accessory battery; wherein the accessory battery is integrated in the plastic resin shell and is configured with the dedicated mobile computing device; and*
*handle grips; wherein the handle grips are molded into the plastic resin shell of the hardened enclosure.*

110.    The Accused '049 Products provide a payment processing apparatus for use in remote point-of-sale transactions, including a dedicated mobile computing device equipped with a hardened enclosure that prevents water and dust from entering, as seen below:



111.    On information and belief, the Accused '049 Products' hardened enclosure is a plastic resin shell and has a rubber inner seal.

112.    The Accused '049 Products' hardened enclosure is configured with an adaptable railing system that allows a display of the dedicated mobile computing device to be tilted for user viewing, as seen below:





113.    On information and belief, the Accused '049 Products' hardened enclosure has display shielding that is a transparent layer that allows viewing of the display.

114.    The Accused '049 Products' hardened enclosure is configured with a magnetic strip card reader that communicates with the dedicated mobile computing device, as seen below:



115. The Accused '049 Products' hardened enclosure is configured with a chip card reader that communicates with the dedicated mobile computing device, as seen below:



116. The Accused '049 Products' hardened enclosure is configured with an RFID that is configured with the dedicated mobile computing device, as seen below:



117.    The Accused '049 Products' hardened enclosure is equipped with an accessory battery, as seen below:





118.    The Accused '049 Products hardened enclosure is equipped with handle grips that are molded into the plastic resin shell, that is the plastic resin shell itself forms the handle grips for the dedicated mobile computing device, as seen below:



119.    Additionally, Barry, Ronin, and the Makina Defendants, have been, and currently are, active inducers of infringement of the '049 Patent under 35 U.S.C. § 271(b) and a contributory infringer of the '049 Patent under 35 U.S.C. §271(c).

120.    Barry, Ronin, and the Makina Defendants have actively induced, and continue to actively induce, infringement of the '049 patent by intending that others (vendors, customers,

users), use the Accused '049 Products, covered by one or more claims of the '049 Patent. Barry, Ronin, and the Makina Defendants provide the Accused '049 Products in substantially the same form as Plaintiffs, wherein customers, partners, vendors, subscribers, and users, who, in turn, in accordance with Barry, Ronin, and the Makina Defendants' design, intent, and directions, use, provision for use, and offer services on the Accused Products in the United States that directly infringe one or more claims of the '049 Patent as described above.

121.    Barry, Ronin, and the Makina Defendants have contributed to, and continue to contribute to, the infringement of the '049 patent by others by knowingly providing one or more components, for example the Katana Tablet mobile computing device, for use by others, as intended by Barry, Ronin, and the Makina Defendants, and by virtue of that use directly infringe one or more claims of the '049 Patent.

122.    Barry, Ronin, and the Makina Defendants knew of the '049 Patent, but were willfully blind to its existence. Barry has had actual knowledge of the '049 Patent since at least the filing of the application on January 28, 2019, by virtue of his role as President of Best Ring.

123.    Plaintiffs will rely on direct and/or circumstantial evidence to prove the intent element. *See Fuji Photo Film*, 394 F.3d at 1377 ("A patentee may prove intent through circumstantial evidence."); *Water Techs.*, 850 F.2d at 668 ("While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice.").

124.    As a result of Barry, Ronin, and the Makina Defendants' acts of infringement, Plaintiffs have suffered and will continue to suffer damages, the specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial, but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the Patents.

## COUNT 4—INFRINGEMENT OF U.S. PATENT NO. 11,361,322
## (AGAINST BARRY, RONIN, AND THE QUEBEC DEFENDANTS)

125.    Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

126.    The inventions claimed in the '322 Patent, taken alone or in combination, were not well-understood, routine, or conventional to one of ordinary skill in the art at the time of the invention. Rather, the '322 Patent claims and teaches, *inter alia*, improvements in a point-of-sale system and method for transaction processing for networked computing devices at an event environment. The invention improved on financial processing interactions when network connectivity was susceptible to failure, and by doing so increased the security of a transaction and the validity of the customer's credit. The invention addressed problems around financial processing when communication to a transaction server and a financial institution was temporarily unavailable, and created a processing system that would utilize real-time transactions and validate credit when a connection was available, and automatically switch to a batch processing mode when interruptions in network connectivity occurred. Further, once network connectivity was established, the invention discloses switching back to a real-time transaction mode to verify customers credit.  Thus, the inventions disclosed within the '322 Patent provided improvements in processing transactions when internet connections may be down due to power failure, equipment malfunction, failure of service, sabotage, or other events that may hamper or otherwise prevent a financial transaction from occurring.

127.    The inventions claimed in the '322 Patent represent technical solutions to an unsolved technological problem that required specialized knowledge and experience to achieve. The written description of the '322 Patent describes, in technical detail, each of the limitations in the claims, equipping a person of ordinary skill in the art to understand what those limitations cover, and therefore what was claimed, and also to understand how the non-conventional and non-

45

generic ordered combination of the elements of the claims differ markedly from what had been performed in the industry. More specifically, the '322 Patent claims a system for point-of-sale transaction processing for networked computing devices. The system includes a dedicated mobile computing device equipped with a processor, memory, and a network adapter. The dedicated mobile computing device is further equipped with a magnetic strip card reader and a chip card reader. The system is further comprised of a customer relationship management application configured to be held in memory on the dedicated mobile computing device, wherein the customer relationship management application comprises a dynamic point of sale engine. The method includes point-of-sale transaction processing at an event environment. The steps include initiating by the point of sale engine, an automatic transaction mode that is equipped to receive a credit transaction. Further improvements in financial processing within a remote environment are included, along with the ability to take various forms of payment such as swipe card, chip card, and RFID.

128.    The system and methods covered by the '322 Patent differs markedly from the prior art in use at the time of the invention, all of which lacked the combination of features to increase durability, reliability, and ability to function automatically during intermittent network connections. Further, the '322 Patent discloses a system that is capable of accepting a diverse set of payment instructions from physical and digital means, including RFID payment processing in a water tight and dust proof enclosure.

129.    The system and methods covered by the '322 Patent are drawn to solve a specific, technical problem arising in the contest of point-of-sale payment transaction in a networked computing environment.

130.     Barry, Ronin, and the Quebec Defendants have directly infringed, and continue to directly infringe, literally and/or by the doctrine of equivalents, individually and/or jointly, at least claim 1, claim 6, and claim 12 of the '322 Patent by making, using, testing, selling, offering for sale, and/or importing into the United States products and components, including services, covered by one or more claims of the '322 Patent. On information and belief, Barry, Ronin, and the Quebec Defendants' point-of-sale products, including but not limited to the Katana Tablet mobile computing device, infringe the '322 Patent, by using the aforementioned hardware and point-of-sale software, either alone or in combination, that operate in substantially the same manner (together the "Accused '322 Products" or "Accused Products").

131.     Claim 1 of the '322 Patent is reproduced below:

*1. A system for Point of Sale ('POS') transaction processing for networked computing devices, comprising:*

*a dedicated mobile computing device, wherein the dedicated mobile computing device is equipped with a processor, memory, and a network adapter;*

*a magnetic strip card reader, wherein the magnetic strip card reader is configured to the dedicated mobile computing device;*

*a chip card reader, wherein the chip card reader is configured to the dedicated mobile computing device; and*

*a customer relationship management application configured to be held in the memory of the dedicated mobile computing device, the customer relationship management application comprising:*

*a dynamic point of sale engine, wherein the dynamic point of sale engine is equipped to dynamically switch from a real-time financial transaction to a batch financial transaction in dependence on operating parameters; wherein the operating parameters include at least one operating parameter based on network connectivity.*

132.     The Accused '322 Products provide a dedicated mobile computing device for transaction processing for networked computing devices, as seen below:



133. The Accused '322 Products provide a dedicated mobile computing device equipped with a processor, memory, and a network adapter, by virtue of the statements that the Katana Tablet is a tablet computing device compatible with Android Square™, wherein the specifications can be found at: https://squareup.com/help/us/en/article/3887-devices-compatible-with-the-square-magstripe-and-chip-card-readers.

134. The Accused '322 Products provide a magnetic strip card reader configured to the dedicated mobile computing device, as seen below:



135. The Accused '322 Products provide a chip card reader configured to the dedicated mobile computing device, as seen below:



136.    The Accused '322 Products provide a customer relationship management application configured to be held in memory on the dedicated mobile computing device, as seen below:



**Ronin POS App**

An intuitive app that anyone can
pick up and start ringing
immediately. Can be swapped out for
Square.







137.    On information and belief, the Accused '322 Products provide a dynamic point-of-sale engine that is equipped to dynamically switch from a real-time financial transaction to a batch financial transaction in dependence on operating parameters, wherein the operating parameters include at least one operating parameter based on network connectivity.

138.    Claim 6 of the '322 Patent is reproduced below:

> *6. A method for Point of Sale ('POS') transaction processing at an event environment, comprising:*
>
> *initiating, by a point of sale engine, automatic transaction mode; wherein the automatic transaction mode is equipped to receive a credit transaction;*
>
> *receiving, by the point of sale engine, a chip card transaction;*
>
> *determining, by the point of sale engine, network connectivity to a financial institution;*
>
> *initiating, by the point of sale engine, based on the chip card transaction and no network connectivity to the financial institution a batch transaction;*
>
> *processing, by the point of sale engine, the batch transaction for a clearance request; wherein processing the batch transaction establishes connection to a local event environment server for the clearance request;*
>
> *transmitting, by the point of sale engine, a batch transaction clearance request to the local event environment server;*
>
> *receiving, by the point of sale engine, creditworthiness based on a repository of credit information on the local event environment server; and*
>
> *processing, the point of sale engine, the chip card transaction; wherein processing places the swipe credit card transaction in a list for batch processing on network restoration.*

139.    The Accused '322 Products provide for point-of-sale transaction processing at an event environment, as seen below:



# FESTIVAL FOCUSED

Quick set up and easy to use point of sale designed for any and all temporary use
situations. The team at Ronin is comprised of individuals with over three decades of
combined festival and event POS experience. Ronin understands the unique needs and
potential problems that are typical in event and festival environments and have designed
this POS to effectively and successfully handle them all.

Ronin accepts almost all types of payment including credit, RFID/cashless, NFC/In-App and
cash. Ronin was developed with festival and event sponsorships in mind. Sponsor
promotions such as BOGO and bonus funds are easily applied. Ronin also offers both
closed (loaded funds) and open loop (tokenized) RFID payment options.

140.    On information and belief, the Accused '322 Products provide that a point-of-sale application is configured for an automatic transaction mode, further, that the transaction is capable of receiving a chip card transaction, as seen below:



141.    On information and belief, the Accused '322 Products provide that the point-of-sale application determines network connectivity to a financial institution, and if there is no network connectivity will batch the transaction.

142.    On information and belief, the Accused '322 Products provide that the point-of-sale application processes the batch transaction by establishing a connection to a local event

environment server, and that the local event environment server returns to the point-of-sale application an indication of creditworthiness, and processes the batch transaction on network restoration.

143.    Claim 12 of the '322 Patent is reproduced below:

*12. A method for Point of Sale ('POS') transaction processing at an event environment, comprising:*

*initiating, by a point of sale engine, automatic transaction mode; wherein the automatic transaction mode is equipped to receive a credit transaction;*

*receiving, by the point of sale engine, a swipe credit card transaction;*
*determining, by the point of sale engine, network connectivity to a financial institution;*

*initiating, by the point of sale engine, based on the swipe credit card transaction and no network connectivity to the financial institution a batch transaction;*

*processing, by the point of sale engine, the batch transaction for a clearance request; wherein processing the batch transaction establishes connection to a local event environment server for the clearance request;*

*transmitting, by the point of sale engine, the batch transaction clearance request to the local event environment server;*

*receiving, by the point of sale engine, creditworthiness based on the repository of credit information on the local event environment server; and*

*processing, by the point of sale engine, the swipe credit card transaction; wherein processing places the swipe credit card transaction in a list for batch processing on network restoration.*

144.    The Accused '322 Products provide for point-of-sale transaction processing at an event environment, as seen below:



# FESTIVAL FOCUSED

Quick set up and easy to use point of sale designed for any and all temporary use situations. The team at Ronin is comprised of individuals with over three decades of combined festival and event POS experience. Ronin understands the unique needs and potential problems that are typical in event and festival environments and have designed this POS to effectively and successfully handle them all.

Ronin accepts almost all types of payment including credit, RFID/cashless, NFC/In-App and cash. Ronin was developed with festival and event sponsorships in mind. Sponsor promotions such as BOGO and bonus funds are easily applied. Ronin also offers both closed (loaded funds) and open loop (tokenized) RFID payment options.

145.    On information and belief, the Accused '322 Products provide that a point-of-sale application that is configured for an automatic transaction mode, further, the transaction is capable of receiving a swipe credit card transaction, as seen below:



146.    On information and belief, the Accused '322 Products provide that the point-of-sale application determines network connectivity to a financial institution, and if there is no network connectivity will batch the transaction.

147.    On information and belief, the Accused '322 Products provide that the point-of-sale application processes the batch transaction by establishing a connection to a local event environment server, and that the local event environment server returns to the point-of-sale application an indication of creditworthiness, and processing the batch transaction on network restoration.

148.    Additionally, Barry, Ronin, and the Quebec Defendants, have been, and currently are, active inducers of infringement of the '322 Patent under 35 U.S.C. § 271(b) and a contributory infringer of the '322 Patent under 35 U.S.C. §271(c).

149.    Barry, Ronin, and the Quebec Defendants have actively induced, and continue to actively induce, infringement of the '322 Patent by intending that others (vendors, customers, users), use the Accused Products, including services covered by one or more claims of the '322 Patent. Barry, Ronin, and the Quebec Defendants provide these products and services in substantially the same form as Plaintiffs, wherein customers, partners, vendors, subscribers, and users, who, in turn, in accordance with Barry, Ronin, and the Quebec Defendants' design, intent, and directions, use, provision for use, and offer services on the Accused Products in the United States that directly infringe one or more claims of the '322 Patent as described above. Barry, Ronin, and the Quebec Defendants' inducement further includes various intake forms, instructions, and direction into using the Accused '322 Products, as seen below:



150.    Barry, Ronin, and the Quebec Defendants have contributed to, and continue to contribute to, the infringement of the '322 Patent by others by knowingly providing one or more components, for example the Katana tablet device, and/or software such as the point-of-sale software responsible for the accused infringing functionality described herein, and that, when installed, configured, or equipped, and used by others, as intended by Barry, Ronin, and the Quebec Defendants, directly infringe one or more claims of the '322 Patent.

151.    Plaintiffs will rely on direct and/or circumstantial evidence to prove the intent element. *See Fuji Photo Film*, 394 F.3d at 1377 ("A patentee may prove intent through circumstantial evidence."); *Water Techs.*, 850 F.2d at 668 (Fed. Cir. 1988) ("While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice.").

152.    As a result of Barry, Ronin, and the Quebec Defendants' acts of infringement, Plaintiffs have suffered and will continue to suffer damages, the specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial, but is in no event less than a reasonable royalty from the date of first infringement to the expiration of the Patents.

**COUNT 5—TRADE DRESS INFRINGEMENT**
**(Lanham Act Section 43(a); 15 U.S.C. § 1125(a))**
**(AGAINST BARRY AND RONIN)**

153.    Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

154.    After years of development, Plaintiffs created unique, distinctive, and non-functional designs for its payment processing apparatus and podium/cash drawer combination (collectively "Payment Processing Products") that have been extensively and continuously promoted and used for years in the United States and Texas.  Plaintiffs have expended an extraordinary amount of time, money, and effort to create and market their Payment Processing Products.

155.    The designs of Plaintiffs' Payment Processing Products have distinctive and non functional features that identify to customers that Plaintiffs are the origin of the Payment Processing Products.  Through extensive, continuous, and exclusive use of the Payment Processing Products, and the highly valuable goodwill and substantial secondary meaning acquired as a result, Plaintiffs have acquired and own trade dress rights in the overall look, design, and appearance of the Payment Processing Products.

156.    An exemplary image of Plaintiffs' Payment Processing Products is shown below:



157.    Plaintiffs have trade dress rights in the overall look, design, and appearance of the

Payment Processing Products, which include:

- a rectangularly shaped resin shell;
- the white color of the resin shell and black chip card reader;
- a magnetic strip card reader disposed on a side portion of the resin shell with a black card slide surface;
- the width of the resin shell above and below the screen is substantially the same width, wherein the width of the resin shell on one side of the screen is greater than the width of the resin shell on the opposed side of the screen;
- a white podium with black cash drawer;
- the color contrast and color combinations of the Payment Processing Products; and
- the relationship of the above-reference features to each other and to other features.

Each of these elements is distinctive and serves to identify Plaintiffs as the source of the

Payment Processing Products.

158.    Barry and Ronin advertise, offer for sale, sell, and/or distribute an Accused Product that infringes Plaintiffs' trade dress. An exemplary image of an Accused Product is shown below:



159.    Barry and Ronin intentionally, knowingly, and willfully designed their Accused Products to have a similar overall look, design, and appearance as Plaintiffs' Payment Processing Products and used in commerce designs identical or confusingly similar to Plaintiffs' Payment Processing Products in connection with the sale, offering for sale, distribution, and advertising of goods, without Plaintiffs' consent, which is likely to cause consumer confusion, or to cause mistake, or to deceive.

160.    Plaintiffs used their trade dress extensively and continuously before Barry and Ronin designed the Accused Products and began selling the Accused Products. Plaintiffs' trade dress acquired secondary meaning prior to the unlawful use of Plaintiffs' trade dress in connection with the Accused Products.

161.     Barry and Ronin have committed trade dress infringement in violation of § 43(a) of the Lanham Act.

162.     As a result of Barry and Ronin's act of infringement, Plaintiffs have suffered and will continue to suffer damages, the specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial.

### COUNT 6—COMMON LAW TRADE DRESS INFRINGEMENT
### (AGAINST BARRY AND RONIN)

163.     Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

164.     Barry and Ronin's sale, offers to sell, distribution, and advertising of their Accused Products that have a similar overall look, design, and appearance, in direct competition with Plaintiffs' Payment Processing Products, constitute common law trade dress infringement and is likely to cause consumer confusion, or to cause mistake, or to deceive.

165.     Barry and Ronin intentionally, knowingly, and willfully designed the Accused Products to have a similar overall look, design, and appearance to Plaintiffs' Payment Processing Products.

166.     Plaintiffs' trade dress is entitled to protection under the common law and includes unique, distinctive, and non-functional designs.  Plaintiffs extensively and continuously promoted and used their trade dress for years in the United States and Texas, and through this extensive and continuous use, Plaintiffs trade dress has become a well-known indicator of origin and quality of Plaintiffs' Payment Processing Products, acquiring substantial secondary meaning in the marketplace.

167.     Plaintiffs' used their trade dress extensively and continuously before Barry and Ronin began selling the Accused Products. Plaintiffs' trade dress acquired secondary meaning prior to the unlawful use of Plaintiffs' trade dress in connection with the Accused Products.

61

168.    Barry and Ronin have committed trade dress infringement in violation of the common law of the State of Texas.

169.    As a result of Barry and Ronin's act of infringement, Plaintiffs have suffered and will continue to suffer damages, the specific dollar amount of damages adequate to compensate for the infringement shall be determined at trial.

### COUNT 7—BREACH OF FIDUCIARY DUTIES
### (AGAINST BARRY)

170.    Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

171.    As an employee and officer of Best Ring, Barry owed Best Ring fiduciary duties. These duties included, among other things: (1) the duty not to appropriate Best Ring's confidential information; (2) the duty not to misappropriate corporate assets or opportunities; (3) the duty of loyalty and utmost good faith; (4) the duty to refrain from self-dealing; (5) the duty to place Best Ring's interests above his own interests; (6) the duty not to divulge Best Ring's trade secrets; (7) the duty not to solicit Best Ring's customers; (8) the duty not to solicit the departure of other Best Ring employees; and (10) the duty to return Best Ring's confidential information upon termination of employment. In addition, Barry owed an informal fiduciary duty of trust and confidence to Best Ring by virtue of their long-term business relationship, as well as Barry's knowledge that, as a result of his tenure and position, Best Ring trusted him implicitly.

172.    Barry breached his fiduciary duties to Best Ring by engaging in the wrongful actions and omissions described above, including but not limited to (i) his misuse of and appropriation of Best Ring's confidential information; (ii) his conspiracy to form Ronin to compete with Best Ring through the misuse of Best Ring's resources and confidential information, (iii) his solicitation of Best Ring customers to Ronin, (iv) his solicitation and recruitment of Bosquez in breach of Bosquez's nondisclosure agreement with Best Ring, and (v) his failure to disclose the

misconduct to Best Ring. These fiduciary breaches resulted in improper benefits to Ronin, Barry, Bosquez, and Schaefer and/or injury to Best Ring.

173.    Best Ring seeks recovery of all actual and consequential damages caused by Barry's breaches of fiduciary duty, and further seeks disgorgement of any benefit received by Barry as a result.

### COUNT 8—BREACH OF FIDUCIARY DUTIES
### (AGAINST BOSQUEZ)

174.    Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

175.    As an employee of Best Ring, Bosquez owed Best Ring fiduciary duties. These duties included, among other things: (1) the duty not to appropriate Best Ring's confidential information; (2) the duty not to divulge Best Ring's trade secrets; and (3) the duty not to solicit Best Ring's customers.

176.    Bosquez breached his fiduciary duties to Best Ring by engaging in the wrongful actions and omissions described above, including but not limited to (i) his misuse of and appropriation of Best Ring's confidential information in breach of the nondisclosure agreement he signed with Best Ring; (ii) his misuse of Best Ring's resources and confidential information in working for Ronin, (iii) his solicitation of Best Ring customers to Ronin, and (iv) his failure to disclose the misconduct to Best Ring. These fiduciary breaches resulted in improper benefits to Ronin, Barry, Bosquez, and Schaefer and/or injury to Best Ring.

177.    Best Ring seeks recovery of all actual and consequential damages caused by Bosquez's breaches of fiduciary duty, and further seeks disgorgement of any benefit received by Bosquez as a result.

### COUNT 9—BREACH OF FIDUCIARY DUTIES
### (AGAINST SCHAEFER)

178.    Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

179.    As an employee and director of operations for Best Ring, Schaefer owed Best Ring fiduciary duties. Those duties included, among other things, (1) the duty not to appropriate Best Ring's confidential information; (2) the duty not to misappropriate corporate assets or opportunities; (3) the duty of loyalty and utmost good faith; (4) the duty to place Best Ring's interests above her own interests; (5) the duty not to divulge Best Ring's trade secrets; and (6) the duty to return Best Ring's confidential information upon termination of employment.

180.    Schaefer breached her fiduciary duties to Best Ring by engaging in wrongful actions and omissions described above, including but not limited to, her misuse of and appropriation of Best Ring's confidential information. This fiduciary breach resulted in improper benefits to Ronin, Barry, Bosquez, and Schaefer and/or injury to Best Ring.

181.    Best Ring seeks recovery of all actual and consequential damages caused by Schaefer's breach of fiduciary duty.

### COUNT 10—CONSPIRACY TO BREACH FIDUCIARY DUTIES
### (AGAINST RONIN, BARRY, BOSQUEZ, AND SCHAEFER)

182.    Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

183.    Ronin, Barry, Bosquez, and Schaefer, in concert or agreement by and among themselves, conspired to engage in breaches of fiduciary duties to Best Ring, as described above. Ronin, Barry, Bosquez, and Schaefer conspired with the goals of (1) forming Ronin to usurp Best Ring's customers and corporate opportunities, and (2) secretly using Best Ring's confidential information and resources to compete against it. Ronin, Barry, Bosquez, and Schaefer knew of and

expressly agreed to engage in such unlawful conduct, which proximately caused Best Ring to suffer damages as a result. Best Ring now seeks recovery of such damages.

### COUNT 11—VIOLATION OF THE FEDERAL DEFEND TRADE SECRETS ACT (AGAINST ALL DEFENDANTS)

184.    Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

185.    Pursuant to the Defend Trade Secrets Act, a party misappropriates a trade secret if he or she: (1) "steals, or without authorization appropriates, takes, carries away, or conceals" such information; (2) "copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;" (3) "receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization;" (4) attempts to commit any of the offenses described above; or (5) conspires with one or more other persons to commit any of the offenses described above. 18 U.S.C. § 1832.

186.    Barry willfully and maliciously violated the Defend Trade Secrets Act by appropriating Plaintiffs' confidential, proprietary, and trade secret information and disclosing it to Ronin, or by attempting to do so, and by conspiring with Bosquez, Schaefer, and Ronin to do so.

187.    Bosquez willfully and maliciously violated the Defend Trade Secrets Act by appropriating Plaintiffs' confidential, proprietary, and trade secret information and disclosing it to Barry and Ronin, or by attempting to do so, and by conspiring with Barry and Ronin to do so.

188.    Schaefer willfully and maliciously violated the Defendant Trade Secrets Act by appropriating Plaintiffs' confidential, proprietary, and trade secret information and using and/or disclosing it to Barry and Ronin, or by attempting to do so, and by conspiring with Barry and Ronin to do so.

189.    Barry willfully and maliciously violated the Defend Trade Secrets Act by using Plaintiffs' confidential, proprietary, and trade secret information that he received from Bosquez and Schaefer when he knew or should have known that Bosquez and Schaefer had a duty— fiduciary, contractual, or otherwise—to maintain the secrecy or limit the use of that information, or by attempting to do so, and by conspiring with Bosquez, Schaefer, and Ronin to do so.

190.    Ronin willfully and maliciously violated the Defend Trade Secrets Act by using Plaintiffs' confidential, proprietary, and trade secret information that it received from Barry, Bosquez, and Schaefer when it knew or should have known that Barry, Bosquez, and Schaefer had a duty—fiduciary, contractual, or otherwise—to maintain the secrecy or limit the use of that information, or by attempting to do so, and by conspiring with Barry, Bosquez, and Schaefer to do so.

191.    Plaintiffs' confidential, proprietary, and trade secret information is related to a product or service used in, or intended for use in, interstate or foreign commerce.

192.    As a result of Defendants' violations of the Defend Trade Secrets Act, Plaintiffs seek actual damages, exemplary damages for Ronin, Barry, Bosquez, and Schaefer's willful and malicious misappropriation, damages for Defendants' unjust enrichment, and attorney's fees as provided for in 18 U.S.C. § 1865.

### COUNT 12—VIOLATION OF THE TEXAS UNIFORM TRADE SECRETS ACT
### (AGAINST ALL DEFENDANTS)

193.    Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

194.    Pursuant to the Texas Uniform Trade Secrets Act, a party misappropriates a trade secret if he or she discloses or uses another party's trade secret without the owner's consent, when he or she knew at the time of disclosure or use that the trade secret was "acquired under circumstances giving rise to a duty to maintain the secrecy of or limit the use of the trade secret"

or "derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of or limit the use of the trade secret." Tex. Civ. Prac. & Rem. Code § 134A *et seq*.

195.    Barry willfully, maliciously, and in bad faith violated the Texas Uniform Trade Secrets Act by disclosing Plaintiffs' confidential, proprietary, and trade secret information to Ronin and by using that information in violation of his duties to keep that information confidential.

196.    Bosquez willfully, maliciously, and in bad faith violated the Texas Uniform Trade Secrets Act by disclosing Plaintiffs' confidential, proprietary, and trade secret information to Barry and Ronin and by using that information in violation of his duties to keep that information confidential.

197.    Schaefer willfully, maliciously, and in bad faith violated the Texas Uniform Trade Secrets Act by disclosing Plaintiffs' confidential, proprietary, and trade secret information to Barry and Ronin and by using that information in violation of her duties to keep that information confidential.

198.    Barry willfully, maliciously, and in bad faith violated the Texas Uniform Trade Secrets Act by using Plaintiffs' confidential, proprietary, and trade secret information that he received from Bosquez and Schaefer when he knew or should have known that Bosquez and Schaefer had a duty to maintain the secrecy or limit the use of that information.

199.    Ronin willfully, maliciously, and in bad faith violated the Texas Uniform Trade Secrets Act by using Plaintiffs' confidential, proprietary, and trade secret information that it received from Barry, Bosquez and Schaefer when it knew or should have known that Barry, Bosquez, and Schaefer had a duty to maintain the secrecy or limit the use of that information.

200.    As a result of Defendants' misappropriation of Plaintiffs' confidential, proprietary, and trade secret information, Plaintiffs seek damages, including exemplary damages for Ronin,

Barry, Bosquez, and Schaefer's willful and malicious misappropriation, and attorney's fees as provided for in Texas Civil Practice and Remedies Code §§ 134A.004.

**COUNT 13—BREACH OF CONTRACT**
**(AGAINST BOSQUEZ)**

201.    Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

202.    The nondisclosure agreement signed by Bosquez was a valid and enforceable contract between Best Ring and Bosquez.

203.    Bosquez breached the nondisclosure agreement as set forth above, including, among other things, the "Maintenance of Confidentiality" provision.

204.    Best Ring has been damaged as a result of Bosquez's breaches of the nondisclosure agreement. Best Ring seeks recovery of all actual and consequential damages caused by these breaches, as well as its attorneys' fees pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

**COUNT 14—TORTIOUS INTERFERENCE WITH EXISTING CONTRACT**
**[BOSQUEZ]**
**(AGAINST BARRY AND RONIN)**

205.    Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

206.    A valid and enforceable contract existed between Best Ring and Bosquez, specifically the nondisclosure agreement described above.

207.    Barry and Ronin willfully and intentionally interfered with the nondisclosure agreement by, among other things, recruiting Bosquez to Ronin to compete with Best Ring through use of Best Ring's confidential information, by misappropriating Best Ring's confidential information through Bosquez, and by causing or encouraging Bosquez to fail to disclose such conduct to Best Ring.

68

208.     The above conduct proximately caused damages to Best Ring, which Best Ring hereby seeks to recover.

209.     Barry and Ronin did not have a right, privilege, justification, or excuse to interfere with Best Ring's contractual relations.

### COUNT 15—BREACH OF CONTRACT
### (AGAINST SCHAEFER)

210.     Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

211.     The Non-Compete Agreement containing a non-competition provision signed by Schaefer was a valid and enforceable contract between Best Ring and Schaefer.

212.     Schaefer breached the Non-Compete Agreement as set forth above, including, among other things, the non-competition provision.

213.     Best Ring has been damaged as a result of Schaefer's breaches of the Non-Compete Agreement. Best Ring seeks recovery of all actual and consequential damages caused by these breaches, as well as its attorneys' fees pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

### COUNT 16—TORTIOUS INTERFERENCE WITH EXISTING CONTRACT
### [SCHAEFER]
### (AGAINST BARRY AND RONIN)

214.     Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

215.     A valid and enforceable contract existed between Best Ring and Schaefer, specifically the Non-Compete Agreement containing the non-competition provision described above.

216.     Barry and Ronin willfully and intentionally interfered with the Non-Compete Agreement by, among other things, recruiting Schaefer to Ronin to compete with Best Ring in Ronin's point-of-sale business.

217.    The above conduct proximately caused damages to Best Ring, which Best Ring hereby seeks to recover.

218.    Barry and Ronin did not have a right, privilege, justification, or excuse to interfere with Best Ring's contractual relations.

### COUNT 17—TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS
### (AGAINST RONIN, BARRY, AND BOSQUEZ)

219.    Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

220.    There was a reasonable probability that Best Ring would have entered into a business relationship pertaining to the ███████.

221.    Ronin, Barry, and Bosquez interfered with the relationship through their independently tortious or unlawful conduct described above. Ronin, Barry, and Bosquez's interference caused Best Ring to lose out on a contract that it otherwise would have had a reasonable probability of securing.

222.    Ronin, Barry, and Bosquez acted with a conscious desire to interfere with the relationship or at least knew such interference was certain or substantially certain to occur.

223.    As a result of Ronin, Barry, and Bosquez's interference, Best Ring suffered lost business revenue and other damages in an amount to be determined at trial.

224.    As a result of Ronin, Barry, and Bosquez's tortious interference, Best Ring seeks actual damages.

### COUNT 18—TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS
### (AGAINST RONIN, BARRY, AND BOSQUEZ)

225.    Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

226.    There was a reasonable probability that Best Ring would have entered into a business relationship pertaining to ████████

227.    Ronin, Barry, and Bosquez interfered with the relationship, and prevented it from occurring, through their independently tortious or unlawful conduct described above. Ronin, Barry, and Bosquez's interference caused Best Ring to lose out on a contract that it otherwise would have had a reasonable probability of securing.

228.    Ronin, Barry, and Bosquez acted with a conscious desire to interfere with the relationship or at least knew such interference was certain or substantially certain to occur.

229.    As a result of Ronin, Barry, and Bosquez's interference, Best Ring suffered lost business revenue and other damages in an amount to be determined at trial.

230.    As a result of Ronin, Barry, and Bosquez's tortious interference, Best Ring seeks actual damages.

### COUNT 19—TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS ████████
### (AGAINST RONIN, BARRY, AND BOSQUEZ)

231.    Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

232.    There was a reasonable probability that Best Ring would have entered into a business relationship pertaining to ████████

233.    Ronin, Barry, and Bosquez interfered with the relationship, and prevented it from occurring, through their independently tortious or unlawful conduct described above. Ronin, Barry, and Bosquez's interference caused Best Ring to lose out on a contract that it otherwise would have had a reasonable probability of securing.

234.    Ronin, Barry, and Bosquez acted with a conscious desire to interfere with the relationship or at least knew such interference was certain or substantially certain to occur.

235.    As a result of Ronin, Barry, and Bosquez's interference, Best Ring suffered lost business revenue and other damages in an amount to be determined at trial.

236.    As a result of Ronin, Barry, and Bosquez's tortious interference, Best Ring seeks actual damages.

### COUNT 20—TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS ████████████ (AGAINST RONIN, BARRY, AND BOSQUEZ)

237.    Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

238.    There was a reasonable probability that Best Ring would have entered into a business relationship pertaining to ████████████ .

239.    Ronin, Barry, and Bosquez interfered with the relationship, and prevented it from occurring, through their independently tortious or unlawful conduct described above. Ronin, Barry, and Bosquez's interference caused Best Ring to lose out on a contract that it otherwise would have had a reasonable probability of securing.

240.    Ronin, Barry, and Bosquez acted with a conscious desire to interfere with the relationship or at least knew such interference was certain or substantially certain to occur.

241.    As a result of Ronin, Barry, and Bosquez's interference, Best Ring suffered lost business revenue and other damages in an amount to be determined at trial.

242.    As a result of Ronin, Barry, and Bosquez's tortious interference, Best Ring seeks actual damages.

### COUNT 21—TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS ████████████ (AGAINST RONIN, BARRY, AND BOSQUEZ)

243.    Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

244.    There was a reasonable probability that Best Ring would have entered into a business relationship pertaining to █████████████

245.    Ronin, Barry, and Bosquez interfered with the relationship, and prevented it from occurring, through their independently tortious or unlawful conduct described above. Ronin, Barry, and Bosquez's interference caused Best Ring to lose out on a contract that it otherwise would have had a reasonable probability of securing.

246.    Ronin, Barry, and Bosquez acted with a conscious desire to interfere with the relationship or at least knew such interference was certain or substantially certain to occur.

247.    As a result of Ronin, Barry, and Bosquez's interference, Best Ring suffered lost business revenue and other damages in an amount to be determined at trial.

248.    As a result of Ronin, Barry, and Bosquez's tortious interference, Best Ring seeks actual damages.

### COUNT 22—TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS ████████████████ (AGAINST RONIN, BARRY, AND BOSQUEZ)

249.    Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

250.    There was a reasonable probability that Best Ring would have entered into a business relationship pertaining to █████████████

251.    Ronin, Barry, and Bosquez interfered with the relationship, and prevented it from occurring, through their independently tortious or unlawful conduct described above. Ronin, Barry, and Bosquez interference caused Best Ring to lose out on a contract that it otherwise would have had a reasonable probability of securing.

252.    Ronin, Barry, and Bosquez acted with a conscious desire to interfere with the relationship or at least knew such interference was certain or substantially certain to occur.

253.    As a result of Ronin, Barry, and Bosquez's interference, Best Ring suffered lost business revenue and other damages in an amount to be determined at trial.

254.    As a result of Ronin, Barry, and Bosquez's tortious interference, Best Ring seeks actual damages.

### COUNT 23—TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS
### (AGAINST RONIN, BARRY, AND BOSQUEZ)

255.    Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

256.    There was a reasonable probability that Best Ring would have entered into a business relationship pertaining to ██████████

257.    Ronin, Barry, and Bosquez interfered with the relationship, and prevented it from occurring, through their independently tortious or unlawful conduct described above. Ronin, Barry, and Bosquez's interference caused Best Ring to lose out on a contract that it otherwise would have had a reasonable probability of securing.

258.    Ronin, Barry, and Bosquez acted with a conscious desire to interfere with the relationship or at least knew such interference was certain or substantially certain to occur.

259.    As a result of Ronin, Barry, and Bosquez's interference, Best Ring suffered lost business revenue and other damages in an amount to be determined at trial.

260.    As a result of Ronin, Barry, and Bosquez's tortious interference, Best Ring seeks actual damages.

### COUNT 24—CONSPIRACY TO INTERFERE WITH BUSINESS RELATIONS
### (AGAINST RONIN, BARRY, AND BOSQUEZ)

261.    Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

262.    Ronin, Barry, and Bosquez, in concert or agreement by and among themselves, conspired to interfere with Best Ring's existing and prospective business relationships, as

described above. Ronin, Barry, and Bosquez were conspiring with the goals of taking Best Ring's employee and customers for Ronin's benefit, including by improper use of Best Ring's confidential information and resources. Ronin, Barry, and Bosquez knew of and expressly agreed to engage in such unlawful conduct, which proximately caused Best Ring to suffer damages as a result. Best Ring now seeks recovery of such damages.

### REQUEST FOR PERMANENT INJUNCTION

263.   Plaintiffs repeat and re-allege each of the preceding paragraphs set forth herein.

264.   Plaintiffs seek a permanent injunction to prevent Defendants from further possessing, distributing, disclosing, misappropriating, or otherwise using Plaintiffs' confidential and proprietary information. Specifically, Plaintiffs seek an injunction ordering Defendants to: (a) return all of Plaintiffs' confidential information in Defendants possession, custody, or control to Plaintiffs; (b) refrain from further possessing, distributing, disclosing, misappropriating, or otherwise using Best Ring's confidential and proprietary information; (c) refrain from violating, and/or causing a violation of, the nondisclosure agreement between Best Ring and Bosquez, and (d) refrain from violating, and/or causing a violation of, the non-competition agreement between Best Ring and Schaefer.

265.   Plaintiffs further seek a permanent injunction to prevent Barry and Ronin from further infringement of Plaintiffs' trade dress.

### ATTORNEY'S FEES

266.   Plaintiffs have been required to engage the services of the undersigned attorneys and have agreed to pay their attorneys a reasonable fee for services expended and to be expended in the prosecution of their claims against Defendants. Plaintiffs seek the recovery of said attorney's

fees, costs, and expenses from Defendants under 15 U.S.C. § 1117; 35 U.S.C. § 285; 18 U.S.C. § 1836; Tex. Civ Prac. & Rem. Code § 134A.005; and Tex. Civ. Prac. & Rem. Code § 38.001.

## DEMAND FOR JURY TRIAL

267.    Plaintiffs hereby demand a jury trial for all issues so triable.

## RESERVATION OF RIGHTS

268.    Plaintiffs hereby reserve all rights relating to the allegations and counts pleaded herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgment in their favor and against Defendants as follows:

A.    Declaring that Ronin, Barry, and the Quebec Defendants have each infringed United States Copyright Reg. No. TXu 2-315-518;

B.    Declaring that Ronin, Barry, and the Quebec Defendants have each infringed, directly and/or indirectly, literally and/or under the doctrine of equivalents, one or more claims of United States Patent No. 10,896,425;

C.    Declaring that Ronin, Barry and the Makina Defendants have each infringed, directly and/or indirectly, literally and/or under the doctrine of equivalents, United States Patent No. 10,854,049;

D.    Declaring that Ronin, Barry, and the Quebec Defendants have each infringed, directly and/or indirectly, literally and/or under the doctrine of equivalents, United States Patent No. 11,361,322;

E.  Awarding damages sufficient to compensate Plaintiffs for Ronin, Barry, the Makina Defendants, and the Quebec Defendants  past infringement as permitted under 35 U.S.C. § 284;

F.  Awarding actual and consequential damages and/or Ronin and Barry's profits to compensate Plaintiffs for Ronin Barry's trade dress infringement under common law and/or 15 U.S.C. § 1117;

G.  Awarding actual and consequential damages, and disgorgement of benefits received, to Plaintiff Best Ring for Barry's, Bosquez's, and Schaefer's breaches of fiduciary duties and Ronin's, Barry's, Bosquez's, and Schaefer's conspiracy to commit the same;

H.  Awarding actual and exemplary damages, and attorneys' fees, to Plaintiff Best Ring for Ronin's, Barry's, Bosquez's, Schaefer's, the Makina Defendants', and the Quebec Defendants' violations of the Federal Defend Trade Secrets Act and the Texas Uniform Trade Secrets Act;

I.  Awarding actual and consequential damages and attorneys' fees, as appropriate, to Plaintiff Best Ring for Bosquez's breaches of contract and Barry and Ronin's tortious interference with Best Ring's existing contract with Bosquez;

J.  Awarding actual and consequential damages and attorney's fees, as appropriate, to Plaintiff Best Ring for Schaefer's breaches of contact and Barry and Ronin's tortious interference with Best Ring's existing contract with Schaefer;

K.  Awarding damages to Plaintiff Best Ring for Ronin, Barry, and Bosquez's tortious interference with Best Ring's prospective relations and for Ronin, Barry, and Bosquez's conspiracy to tortiously interfere with the same;

L.  Awarding attorney's fees and/or expert expenses and/or costs pursuant to any of the following, as relevant: 35 U.S.C. § 285; 18 U.S.C. § 1836; 15 U.S.C. 1117; Tex. Civ. Prac. & Rem. Code § 134A.005; Tex. Civ. Prac. & Rem Code § 38.001; or as otherwise permitted by law;

M.  Awarding prejudgment and post-judgment interest;

N.  Awarding court costs;

O.  Ordering injunctive relief as requested herein; and

P.  Awarding such other costs and further relief as the Court may deem just and proper.

Dated: July 21, 2023                 Respectfully submitted,

                                     By: */s/ William G. Cochran*_____
                                         Paige A. Amstutz
                                         State Bar No. 00796136
                                         pamstutz@scottdoug.com
                                         William G. Cochran
                                         State Bar No. 24092263
                                         wcochran@scottdoug.com
                                         Stephen L. Burbank
                                         State Bar No. 24109672
                                         sburbank@scottdoug.com
                                         **SCOTT DOUGLASS &**
                                         **McCONNICO LLP**
                                         303 Colorado Street, Suite 2400
                                         Austin, Texas 78701-2589
                                         (512) 495-6300 (telephone)
                                         (512) 495-6399 (fax)

                                     By: */s/ Bryan L. Baysinger*_____
                                         Bryan L. Baysinger (Admitted *pro hac vice*)
                                         bbaysinger@nexsenpruet.com
                                         Kirsten Small (Admitted *pro hac vice*)
                                         ksmall@nexsenpruet.com
                                         Seth Hudson (Admitted *pro hac vice*)
                                         shudson@nexsenpruet.com
                                         **NEXSEN PRUET, LLC**
                                         104 South Main Street, Suite 900
                                         Greenville, South Carolina 29601
                                         (864) 370-2211 (telephone)
                                         (864) 282-1177 (fax)

                                         ***COUNSEL FOR PLAINTIFFS***

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure and Local Rule CV-5, I hereby certify that, on July 21, 2023, all counsel of record who have appeared in this case are being served with a copy of the foregoing via the Court's CM/ECF system.

*/s/ William G. Cochran*
William G. Cochran